## UNITED STATES DISTRICT COURT
## DISTRICT OF COLORADO

### CASE NO: 1:23-cv-00490-MDB

DAVID ULERY and THOMAS
DOUGHTY, individually and
on behalf of all others similarly situated,

      Plaintiffs,

      v.

INSURANCE SUPERMARKET, INC.
and EDM LEADS, LLC,

      Defendants.
_____/

### AMENDED CLASS ACTION COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL

Plaintiffs, DAVID ULERY ("Ulery") and THOMAS DOUGHTY ("Doughty") (hereinafter collectively "Plaintiffs"), bring this class action pursuant to Rule 23 of the Federal Rules of Civil Procedure against Defendants, INSURANCE SUPERMARKET, INC. ("INSURANCE SUPERMARKET") and EDM LEADS, LLC ("EDM") (collectively "Defendants") for their violations of the Telephone Consumer Protection Act, 47 U.S.C. 227 (hereinafter "the TCPA"), the regulations promulgated thereunder and the Texas Business & Commerce Code.  In support, Plaintiffs allege as follows:

### PRELIMINARY STATEMENT

1.      Plaintiffs bring this Amended Class Action Complaint for damages, injunctive relief, and any other available legal or equitable remedies, resulting from the illegal actions of Defendants in negligently or willfully contacting Plaintiffs on their cellular telephones, in violation of the Telephone Consumer Protection Act, 47 U.S.C. § 227 ("TCPA") and the Do-Not-Call

("DNC") provisions of the TCPA, and the Texas Business & Commerce Code, including for playing prerecorded messages during autodialed calls to Plaintiffs and others, thereby invading Plaintiffs' privacy.  Plaintiffs allege as follows upon personal knowledge as to themselves and their own acts and experiences, and, as to all other matters, upon information and belief, including investigation conducted by their attorneys.

2.      As the Supreme Court has explained, "Americans passionately disagree about many things. But they are largely united in their disdain for robocalls." *Barr v. Am. Ass'n of Political Consultants,* 140 S. Ct. 2335, 2343 (2020).

3.      While promoting and selling their services, Defendants and/or their agents placed thousands of nonconsensual automated calls using an artificial or prerecorded voice to consumers' telephone numbers nationwide using an automatic telephone dialing system in violation of the TCPA.

4.      Plaintiffs and each Class Member received unwanted telephone robocalls from, or on behalf of, Defendants without proper regard to the TCPA, the Do-Not-Call Rules, and in disregard for individual privacy. Plaintiffs and Class Members' phone numbers were registered with the National Do-Not-Call Registry.  This lawsuit challenges all calls that were sent by, or on behalf of, Defendants to Plaintiffs and Class Members from approximately February 2019, through the date of preliminary approval of class certification.

5.      "Month after month, unwanted robocalls and texts, both telemarketing and informational, top the list of consumer complaints received by the [FCC]."[1] Unwanted calls are the number one consumer complaint to the Commission.[2]

6.      The TCPA is designed to protect consumer privacy by, among other things, prohibiting the making of autodialed or prerecorded-voice calls to cell phone numbers and failing to institute appropriate do-not-call procedures. 47 U.S.C. § 227(b)(1)(A)(iii); 47 C.F.R. § 64.1200(d).

7.      The TCPA was designed to prevent calls like the ones described within this Amended Complaint, and to protect the privacy of citizens like Plaintiffs. "Voluminous consumer complaints about abuses of telephone technology – for example, computerized calls dispatched to private homes – prompted Congress to pass the TCPA." *Mims v. Arrow Fin. Servs., LLC,* 132 S. Ct. 740, 744 (2012).

8.      Additionally, the FCC has explicitly stated that the TCPA's prohibition on automatic telephone dialing systems "encompasses both voice calls and text calls to wireless numbers including, for example, short message service (SMS) calls." U.S.C.A. Const. Amend. 5; Telephone Consumer Protection Act of 1991, § 3(a), 47 U.S.C. § 227(b)(1)(A)(iii). *Kramer v. Autobytel, Inc.,* 759 F. Supp. 2d 1165 (N.D. Cal. 2010).

9.      In enacting the TCPA, Congress intended to give consumers a choice as to how companies may call them and made specific findings that "[t]echnologies that might allow consumers to avoid receiving such calls are not universally available, are costly, are unlikely to be

---

1.      *In re Rules & Regs. Implementing the TCPA*, 30 FCC Rcd. 7961, ¶ 1 (2015).
2.      *Rep. to Cong. on Caller Id Authentication Implementation Progress*, 2020 WL 7863050, at *1 (OHMSV Dec. 29, 2020)

enforced, or place an inordinate burden on the consumer.  TCPA, Pub.L. No. 102–243, § 11. Toward this end, Congress found that:

> [b]anning such automated or prerecorded telephone calls to the home, except when the receiving party consents to receiving the call or when such calls are necessary in an emergency situation affecting the health and safety of the consumer, is the only effective means of protecting telephone consumers from this nuisance and privacy invasion.

> *Id.* at § 12; *see also Martin v. Leading Edge Recovery Solutions, LLC*, 2012 WL 3292838,

at *4 (N.D. Ill. Aug. 10, 2012) (citing Congressional findings on TCPA's purpose).

10.     In an action under the TCPA, a plaintiff must only show that the defendant "called a number assigned to a cellular telephone service using an automatic dialing system or prerecorded voice." *Breslow v. Wells Fargo Bank, N.A.*, 857 F. Supp. 2d 1316, 1319 (S.D. Fla. 2012), *aff'd*, 755 F.3d 1265 (11th Cir. 2014).

## JURISDICTION AND VENUE

11.     This Court has federal question subject matter jurisdiction pursuant to 28 U.S.C. § 1331 and 47 U.S.C. § 227.

12.     Venue in this judicial district is proper under 28 U.S.C. § 1391(b)(2), because a substantial part of the events or omissions giving rise to the claims in this case occurred in this District, including Defendants' transmission, either directly or through persons on their behalf, of the unlawful and unwanted calls to Plaintiff Ulery and other Class Members in this District on their residential telephone numbers with Colorado area codes – consumers with Colorado area codes, including those who were registered with the National DNC Registry.

13.     Plaintiff Ulery resides in Colorado Springs, Colorado, where the subject robocalls to him and Class Members in Colorado were received, within the jurisdiction of this Court.

4

14.     Plaintiff Doughty resides in Kempner, Texas. He received the same prerecorded calls as Plaintiff Ulery and other Class Members who received the same prerecorded calls in Colorado. Defendant Insurance Supermarket has stipulated and agreed to consent to this Court's jurisdiction. Defendant Insurance Supermarket has stipulated to not challenge personal jurisdiction for Plaintiff Doughty's claims presented in this action, in lieu of Plaintiff Doughty presenting his claims in another jurisdiction. Regardless, because Plaintiff Doughty's claims arise from the same type of activity that was directed to Plaintiff Ulery and other Colorado residents this Court may exercise jurisdiction over Defendants for his claims, and in doing so, it does not offend the traditional notions of fair play and substantial justice.

15.     The Court has personal jurisdiction over Defendants because they conduct business in this state, market their services within this state, solicit consumers to purchase their products and services in this state, employ or hire persons to market and sell their products and services in this state, including the persons who placed calls to Plaintiff Ulery's and other Colorado residents' Colorado telephone numbers, and have availed themselves to the jurisdiction of this state by placing, either directly or through authorized agents or telemarketers, calls to Plaintiff and Class Members in this state.

**PARTIES**

16.     Plaintiff Ulery's domicile is in Colorado Springs, Colorado.

17.     Plaintiff' Doughty's domicile is in Kempner Texas.

18.     Defendant INSURANCE SUPERMARKET is a Delaware company with a principal address located at 1951 Northwest 7th Avenue, #600, Miami, FL 33136. Its registered agent is Shawn Kehoe at the same address. Its CEO and founder is Alex Dudarev. INSURANCE

SUPERMARKET operates a website known as insurance-supermarket.com, which describes itself as a company that provides a full range of life insurance and investment products.

19.     Based on Insurance Supermarket's records, Defendant, EDM, is an Arizona company with an address at 1166 E. Warner Rd, Gilbert, AZ 85296. It's Chief Operating Officer is Jamal English. EDM is a lead generator or marketer who is hired, employed, retained, and/or contracted with Insurance Supermarket to place calls on behalf of Insurance Supermarket, including the calls placed to Plaintiffs and Class Members. Defendant Insurance Supermarket has identified EDM as the lead generator whom it has a contractual relationship with to place calls on its behalf, and based on Insurance Supermarket's records, is the lead generator who at least placed the calls to Plaintiff Doughty.

20.     Defendants, either directly or through persons on their behalf, use a common business practice of spamming consumers with unsolicited robocalls to generate leads and to sell its products and services.

21.     Defendants promote and market their services and products by authorizing calls to cellular phone users in violation of the TPCA.

22.     Defendants, directly, individually, jointly, and/or in concert with another, or through other persons, entities or agents acting on their behalf, conspired to, agreed to, contributed to, authorized, facilitated, assisted with, ratified, turned a blind eye to, and/or otherwise caused all of the wrongful acts and omissions, including the dissemination of the unsolicited calls that are the subject matter of this Amended Complaint.

## **FACTUAL ALLEGATIONS**

23.     Defendants engage in the marketing, promotion, and sale, of insurance plans and products to consumers across the country.

6

24.     Defendants, either directly or through authorized lead generators, sales agents, vendors, and/or contractors promote Insurance Supermarket's products and services through the use of unlawful telemarketing campaigns.

25.     To increase the sales volume and profits of their products and services, Defendants and/or its authorized brokers, sub-brokers, lead generators, marketers, and/or sales agents, repeatedly called thousands of consumers using a prerecorded and/or artificial voice in violation of the TCPA.

26.      Plaintiffs know the calls were prerecorded and/or used an artificial voice because the distinct nature of the voice was clearly from a recording and after the recorded voice ended the calls were eventually transferred to a live person.

27.     The prerecorded robocalls sounded identical and had the identical or substantially similar message.

**The Calls to Plaintiff Ulery**

28.     Plaintiff Ulery received at least 15 calls from Defendants or someone on Defendants' behalf, beginning on or about December 21, 2022 through January 30, 2023.

29.     Upon information and belief, the telemarketing robocalls were made using an Automatic Telephone Dialing system ("ATDS").

30.     The impersonal and generic nature of the prerecorded and artificial voice that Defendants sent to Plaintiff Ulery demonstrates that Defendants used an ATDS to send the subject calls.

31.     All the calls were received on Ulery's DNC registered personal Colorado cellular telephone number ending in "7000," with Colorado area code 719. The number is used by Ulery

for residential purposes and is considered by him to be a residential number.  Ulery does not have a traditional landline.

32.     Ulery's full telephone number has already been provided to counsel for Insurance Supermarket. It is not being provided in this Amended Complaint, a public document, to prevent further unwanted and unauthorized calls to him.

33.     On December 21, 2022 Ulery received a call from spoofed number 719-285-3253 After Ulery answered the call there was a distinct silence, followed by a rain drop or click sound. After a few more seconds of silence, Ulery was greeted by a prerecorded/AI voice who identified herself as "Sam from DIS/BIS Insurance."[3] The prerecorded voice was a script offering on Final Expense and Life Insurance. The AI voice then requested personal information from Ulery to pre-qualify him in order to transfer him to a "specialist." After providing some qualifying information to a live representative ("Gatekeeper"), including Ulery's age, the caller disconnected the call.

34.     The Gatekeeper is believed to be EDM based on the information provided by Insurance Supermarket confirming that EDM is Insurance Supermarket's lead generator, and because Ulery received the identical prerecorded "Sam" calls as Doughty.

35.     On December 22, 2022, Ulery received another call this time from spoofed number 719-226-2894. Ulery again answered the call and heard distinct silence, followed by a rain drop or click sound, and was again greeted by the same prerecorded/AI voice who identified herself as

---

[3].     Although it is difficult to decipher whether the pre-recorded voice is saying "BIS" or "DIS," it sounds more likely to be saying "BIS." However, it is immaterial because, as alleged more fully below, Plaintiff Doughty was eventually connected to Defendant Insurance Supermarket's live insurance agent following his receipt of the identical "Sam" calls placed to Plaintiff, and Insurance Supermarket's counsel has confirmed to Plaintiff's counsel that the agent, Dionne Dearing, is an employee or broker of Insurance Supermarket.

"Sam from DIS/BIS Insurance." After being transferred to a live Gatekeeper, the caller disconnected the call.

36.     On January 4, 2023, Ulery was called twice from spoofed number 719-212-1031. Ulery ignored the first call but answered the second call. On the second call, Ulery was again greeted by the same prerecorded/AI voice who identified herself as "Sam from DIS/BIS Insurance." After being transferred to a live Gatekeeper, the caller disconnected the call.

37.     On January 7, 2023, Ulery was called from spoofed number 719-287-6816. Ulery was again greeted by the same prerecorded/AI voice who identified herself as "Sam from DIS/BIS Insurance." After being transferred to a live Gatekeeper, the caller disconnected the call.

38.     On January 11, 2023, Ulery was called from spoofed number 719-277-7195. Ulery was again greeted by the same prerecorded/AI voice who identified herself as "Sam from DIS/BIS Insurance." After being transferred to a live Gatekeeper, the Gatekeeper asked Ulery if he was confined or in a hospital, if he had dementia, and if he can go to the bathroom and dress himself without assistance, as qualifier questions for life insurance. The live Gatekeeper then disconnected the call.

39.     On January 13, 2023, Ulery was called from spoofed number 520-580-9462. Ulery was again greeted by the same prerecorded/AI voice who identified herself as "Sam from DIS/BIS Insurance." After being transferred to a live Gatekeeper the caller disconnected the call. Before disconnecting the call, the Gatekeeper asked Ulery if his name was David. Ulery confirmed and the Gatekeeper said, "one moment please," and then disconnected the call.

40.     On January 14, 17, 18 (3 calls), 19, and 30 (2 calls) 2023, Ulery received more calls from Defendants (all from different spoofed numbers), all from the same prerecorded/AI voice

who identified herself as "Sam from DIS/BIS Insurance." On each of these calls, after being transferred to a live Gatekeeper, the caller disconnected the call.

41.　　On the first January 18, 2023, Ulery expressly and clearly requested that Defendants "STOP" calling him when speaking to Defendants' live Gatekeeper. Ulery advised the Gatekeeper that he had been receiving the "Sam" calls on a nearly daily basis. The Gatekeeper then disconnected the call.　Ulery attempted to tell the Defendants' Gatekeepers to stop calling him on prior calls as well, but he was disconnected by the caller when Ulery began to inquire about the identity of the caller.

42.　　On the second January 18, 2023 call, Ulery directly asked the Gatekeeper if his telephone number and/or name was in the caller's system because Ulery is on the DNC list and had requested to not be called. The Gatekeeper then looked at his system and told Ulery "you are on the Federal DNC and are Blacklisted." The Gatekeeper apologized and then disconnected the call.

43.　　On the third January 18, 2023 call, after Ulery began questioning the Gatekeeper about the identity of his company, the Gatekeeper disconnected the call.

44.　　On each of the above calls, the Gatekeeper intercepted the call to screen it before transferring the call to Defendant Insurance Supermarket directly.

45.　　Defendants utilize a common practice whereby companies, like Insurance Supermarket, employ third party marketers and lead generators, like EDM, to screen and obtain warm leads before Insurance Supermarket's employees speak with the prospective customer. In doing so, Defendants use employed marketers and lead generators as strawmen to attempt to create a liability shield around Insurance Supermarket so that there is no record of the calls placed to Plaintiffs in Insurance Supermarket's computer, data, and ESI systems.

10

46.     Because Insurance Supermarket's Gatekeeper intercepts the calls and disconnects DNC registered and other blacklisted numbers before transferring them to Insurance Supermarket, Insurance Supermarket's internal system does not have a record of calls placed to Plaintiff Ulery. After the initiating call is placed using the pre-recorded script, Defendants' employed Gatekeeper uses databases and other tools such as TCPAtools.com to disconnect "blacklisted" numbers before transferring them to Insurance Supermarket. But, Insurance Supermarket's employed marketers, lead generators, and Gatekeepers, including EDM, do maintain records of all calling activity and billing activity in its regular course of business, and it is within Insurance Supermarket's control to request and obtain this information from them.

47.     The "Sam" prerecorded call is initiated by the same or a related marketer who is the Gatekeeper, EDM, or one of its employed agents. Discovery will confirm if it is one or more persons or entities involved in the placement of the calls prior to transferring to Insurance Supermarket.

**The Calls to Doughty**

48.     Ulery's and undersigned counsel's investigation has revealed that INSURANCE SUPERMARKET is the true source of the entity on behalf of whom the "Sam" calls were placed.

49.     During 2022 and 2023, Plaintiff Doughty received over 10 of the identical prerecorded "Sam" calls with the same script (using the identical words, tone, speed, and inflection) of the calls placed to Plaintiff Ulery on Doughty's Federal DNC registered numbers ending in "0995" and "4946".[4] These numbers are used by Doughty and his family for residential

---

[4].     Doughty's full telephone numbers will be provided directly to counsel for Defendants. It is not being provided in this Amended Complaint, a public document, to prevent further unwanted and unauthorized calls to him.

purposes and are considered by him and his family to be residential numbers. Doughty does not have a traditional landline.

50.     Like Ulery's calls, the Gatekeeper intercepted the calls and then disconnected them upon seeing that Doughty's number had been "blacklisted" on the DNC list. Also, like Plaintiff Ulery, Doughty told "Sam" and the Gatekeeper to please stop calling him.

51.     For example, on:

  A. On March 15, 2022 at 10:48 a.m. he was initially called on his number ending in "0995" by the AI voice "Sam" and then transferred to the Gatekeeper's live agent who disconnected the call;

  B.  On March 15, 2022 at 2:55 p.m. he was called again on his number ending in "0995" by the AI voice "Sam" and then transferred to the Gatekeeper's agent who live agent who disconnected the call;

  C. On March 15, 2022 at 3:19 p.m. he was called again on his number ending in "0995" by the AI voice "Sam" and then transferred to the Gatekeeper's agent who live agent who disconnected the call;

  D. On June 2, 2022 at 11:55 a.m. he was called again on his number ending in "0995" by the AI voice "Sam" and then transferred to the Gatekeeper's agent who live agent who disconnected the call;

  E. On November 14, 2022 at 1:14 p.m. he was called again on his number ending in "0995" by the AI voice "Sam." He told "Sam" to "STOP" calling in response to her prompts; and

F.  He was again called on his number ending in "0995" on at least March 25, 2022, April 4, 2022, June 6, 2022, and November 22, 2022. On each of these calls the Gatekeeper either hung up or disconnected the call;

52.  Because the calls placed to Ulery's and Doughty's DNC registered numbers were intercepted and disconnected by Ulery's employed Gatekeeper, EDM, before transferring directly to Insurance Supermarket, it demonstrates that Insurance Supermarket, EDM, and/or their employed vendor(s) failed to institute procedures for maintaining a list of persons who request not to receive telemarketing calls and those registered on the Federal DNC list. Insurance Supermarket and EDM's common business practice is to "call first and ask questions later."

53.  Because the Gatekeeper disconnects the calls prior to transferring them to Insurance Supermarket, rather than not initiating the calls in the first place, it demonstrates that EDM fails to check the DNC registry or any internal DNC list prior to placing the calls despite having this information available to it, and that the prerecorded calls are initiated using an ATDS. If an ATDS was not used, then EDM vendor would have screened out the call prior to initiating it.

54.  But, on January 7, 2023 Doughty received the identical prerecorded "Sam" call to his secondary cellular telephone number ending in "5788."[5] Because the call was placed to Doughty's Non-DNC number, the Gatekeeper, for the first time, transferred Doughty to Insurance Supermarket directly. The caller identified herself as "Beshay" (phonetic) "with Insurance Supermarket." She advised that the call was being recorded. After requesting a few additional qualifying questions about Doughty's health, "Beshay" then transferred the call to Dionne

---

[5].  Doughty's full telephone number has already been provided directly to counsel for Insurance Supermarket. It is not being provided in this Amended Complaint, a public document, to prevent further unwanted and unauthorized calls to him.

Dearing, an Insurance Supermarket Senior Life Adviser, an employee, broker and agent of Insurance Supermarket.

55.     Ms. Dearing advised that she was physically located in Florida but provided services to people all around the country. She advised that Insurance Supermarket is a "one stop shop" for all life insurance and final expense plans. Doughty questioned Ms. Dearing about the source of the "Sam from BIS/DIS" calls and she stated "*I'll be honest, we have a couple of companies that work for us prior to sending you guys over to us*." Ms. Dearing stated, "*We just got 2 new companies that are doing that and I need to ask them who that is because someone else had asked me the same thing and they were trying to call them back but they are not numbers you can call back*."

56.     Doughty's exchange with Ms. Dearing establishes that the "Sam" calls were placed on behalf of Insurance Supermarket, and that Insurance Supermarket had knowledge of the "Sam" calls but continued to utilize the "Sam" vendor, EDM, and accept qualified transfers from the EDM –establishing, notice, willfulness and ratification of the unlawful calls.

57.     Additionally, even after Doughty's exchange with Ms. Dearing, he continued to receive more calls using the identical "Sam" script on his DNC registered number ending in "4946" on March 13, 2023, March 15, 2023, and March 20, 2023 – further demonstrating Defendants' continued use and ratification of the unlawful "Sam" calls.

58.     As part of Ulery's and Insurance Supermarket's Rule 26 conferrals, undersigned counsel provided Doughty's telephone number directly to counsel for Insurance Supermarket, played by Zoom the recordings of the "Sam" prerecorded calls placed to Ulery and the identical one placed to Doughty, and Doughty's conversation with Ms. Dearing where she acknowledged prior notice of the "Sam" calls being reported to her by other prospective customers. Undersigned

counsel also confirmed the full name and identity of Doughty to Insurance Supermarket's counsel. Insurance Supermarket's counsel has confirmed that Ms. Dearing is in fact one of Insurance Supermarket's licensed brokers and that Insurance Supermarket was able to confirm and corroborate the call upon searching its ESI systems or other call records.

59.     Insurance Supermarket's counsel has also verified to undersigned counsel that EDM is one of Insurance Supermarket's employed vendors whom it contracted to solicit and obtain prospective customers, including Doughty.

60.     Insurance Supermarket's employed vendor's use of the "Sam" script is a common tactic utilized by marketers and lead generators to use a familiar and legitimate sounding name to establish credibility and trust with a prospective customer. But, EDM is not actually associated with or hired by any company called BIS or DIS, it is just using that name in the script to keep the prospective customer on the line and to shield its true identity and the identity of Insurance Supermarket from exposure to avoid getting caught.

61.     Based on the information known to-date, including the corroborating information confirmed by Insurance Supermarket in this litigation, the chain of call flow is depicted below:



62.    To further investigate the source of the calls, Ulery personally spoke with the owner of the real BIS Insurance, Sue Shrum. Ms. Shrum advised that her company does not place any calls and that no vendor or marketer places calls on its behalf. BIS Insurance's website also has a posting on its homepage at https://bisinsurancegroup.com clearly cautioning the public that "we have received several reports that a company is delivering unsolicited phone calls claiming to be BIS insurance. **We do not solicit over the phone!** Federal authorities are now involved, but if you receive an automated robo-call from someone claiming to be BIS Insurance Group, please note the phone number and either report it to us, or report it to the authorities."  Ulery reported the calls to

BIS Insurance, and through Plaintiffs' efforts in this litigation, the source of the fake "Sam with BIS" calls has now been discovered.

63.     Ulery's call with Ms. Shrum further demonstrates that BIS is not involved with the placement of the calls, but rather Insurance Supermarket's employed vendor, EDM, is using the prerecorded "Sam" script falsely using BIS to lure in leads and to attempt to conceal Defendants' identity.

64.     Through the above unsolicited phone calls, Defendants contacted Plaintiffs on their personal and residential cellular telephones regarding an unsolicited service using an artificial or prerecorded voice and/or via an ATDS, as defined by 47 U.S.C. § 227(a)(1) and prohibited by 47 U.S.C. § 227(b)(1)(A).

65.     This ATDS has the capacity to store or produce telephone numbers to be called, using a random or sequential number generator.

66.     This ATDS has the capacity to store numbers and to dial numbers without human intervention.

67.     In other words, no human being physically dialed each digit of Plaintiffs' and Class Members' telephone numbers – the calls were made using equipment with the capacity to dial many phone numbers in a short period of time, without human intervention.

68.     Defendants used a combination of hardware and software systems which have the capacity to generate or store random or sequential numbers or to dial sequentially or randomly in an automated fashion without human intervention.

69.     Defendants utilized the ATDS to send the subject phone calls *en masse* to Plaintiffs and Class Members using an autodial function regardless of whether these individuals had

provided express written consent or had registered their phone numbers on the National Do Not Call Registry.

70.     Based upon information and belief, most call recipients were sent more than one call, and Defendants lacked an adequate system for preventing autodialed or prerecorded-voice calls to phones for which they do not have consent.

71.     Defendants failed to have in place adequate and reasonable procedures to ensure that its employed vendors, including EDM, were not violating the TCPA, and then disregarded or turned a blind eye to its conduct so that it could monetize the leads obtained through its vendors.

72.     The content of the phone calls (selling life insurance and final expense insurance) made to Plaintiffs and the Class Members show that they were for marketing purposes and thus required Plaintiffs' prior express written consent.

73.     The telephone numbers Defendants called were assigned to a cellular telephone service for which Plaintiffs incur a charge for incoming calls pursuant to 47 U.S.C. § 227(b)(1).

74.     The calls also tied up Plaintiffs' telephone lines and rendered them unusable during the calls.

75.     These calls were not for emergency purposes as defined by 47 U.S.C. § 227(b)(1)(A)(i).

76.     Plaintiffs did not provide Defendants or their agents prior consent to receive these calls to their cellular telephones; therefore, the unsolicited calls violated 47 U.S.C. § 227(b)(1).

77.     The calls made to Plaintiffs and the Class Members were for the purpose of marketing, advertising, and promoting Defendants' business and services to Plaintiffs.

78.     Defendants are and were aware, or should have known through the exercise of reasonable diligence, they was placing unsolicited calls to Plaintiffs and other consumers without

their prior consent. Defendant, Insurance Supermarket, has previously received consumer complaints regarding unlawful telemarketing conduct, yet it did not change its business practices. For example:

> "This company has *a habit of placing illegal robocalls* and then, when confronted with the evidence, tries to say it wasn't them because the person I spoke to spoke with an Asian accent and they don't have call centers in *****. Worst excuse I've ever heard. I would not trust this company with my money."

***

> "*Despite being on the Do Not Call Registry, I received a call with a spoofed number* from ***** trying to sell me life insurance. The *thief on the line thought I am a senior citizen, which makes this all the more reprehensible.* I answered his questions to see on whose behalf he was calling and was transferred to a woman (also offshore) who finally told me she was *calling for Insurance Supermarket*"

***

> "I have *caught "Insurance Supermarket Inc." making marketing calls to my cellphone numerous times*. I attempted to contact them, to ask them to stop, as they are not supposed to be calling numbers on the Do Not Call list, but they have completely ignored me, and won't address the issue. *They continue to harass me* with these phone calls."

***

> "*Nuisance calls from numerous different phone numbers -- up to 12 per day including Saturdays and Sundays*."

***

> "This company's lead generation agency has been *calling me upwards of 20 times a day from ***** with spoofed caller ID numbers*."

***

> "During the last six to eight months, *I have received over 60 telemarketing calls by this company's third party advertiser*. During one of the more recent calls, my husband answered, used a fake name, and managed to "play along" long enough to get the company's name and website. He actually recorded

19

the entire call. After that, *we contacted Insurance Supermarket to get the matter resolved.*"

\*\*\*

*Insurance Supermarket, \*\*\*\* aka Insurance Supermarket International, has violated the \*\*\*\* by employing Lead Generation companies to solicit the sale of final expense insurance and falsifying opt-ins* for the purposes of skirting the \*\*\*'s \*\*\*\* and the \*\*\*\*\* I have received numerous calls, from the call centers employed by ISI, after they were told not to call because my numbers are on the \*\*\*\*\* I was eventually transferred over to one of their agents and explained to them the same thing and that I, in no way, gave them expressed written permission or oral consent to contact me. After confronting ISI about the illegal; telephone calls and solicitations, they proceeded to supply me with a false opt-in . . ."[6]

79.     In addition to publicly available online complaints, Insurance Supermarket has been previously sued, or is involved in on-going litigation, due to alleged unlawful calls placed by Insurance Supermarket or on its behalf in violation of the TCPA. *See Cacho v. Insurance Supermarket Inc. et al 6:2022cv01337; Kemp v.  Insurance Supermarket Inc. 1:2022cv21529; and McCaulou-Bernatz et al v.  Insurance Supermarket, Inc. 3:2023cv00005 (Filed 01/03/2023).*

80.     Plaintiffs were damaged by Defendants' calls. In addition to using Plaintiffs' cellular data, phone storage, and battery life, their privacy was wrongfully invaded, their seclusion was intruded upon, and Plaintiffs have become understandably aggravated with having to deal with the frustration of repeated, unwanted, harassing, time consuming, and nuisance phone calls, forcing them to divert attention away from personal time, homelife, and work, and causing disruption to their work, sleep, and other activities. The calls are a disruptive nuisance. Not only did the receipt of the phone calls distract and take time away from Plaintiffs' personal and work

---

6.     Better Business Bureau, https://www.bbb.org/us/fl/miami/profile/life-insurance/insurance-supermarket-inc-0633-90606061/complaints?page=1.  (last visited February 21, 2023)

activities, but Plaintiffs were also forced to spend significant time investigating the source calls. *See Muransky v. Godiva Chocolatier, Inc.,* 905 F.3d 1200, 1211 (11th Cir. 2018). ("[T]ime wasting is an injury in fact"…. "[A] small injury… is enough for standing purposes");*See, e.g., Mims v. Arrow Fin. Servs., Inc.*, 132 S. Ct. 740 (Jan. 18, 2012) (discussing congressional findings of consumer "outrage" as to autodialed and prerecorded calls).

81.     Class Members have similarly suffered harm. "These calls aren't just a nuisance—they add up to billions of dollars lost to fraud, undermine consumer confidence in the phone network, and harm public safety."[7]

82.     To investigate the companies responsible for the unwanted, illegal and unauthorized calls to Plaintiffs' personal cell phones, Plaintiffs wasted time speaking with Defendants' representatives and agents and conduced independent research. But for Plaintiffs' efforts, Defendants' identity would continue to be concealed.

83.     Plaintiffs had no relationship with Defendants prior to these illegal phone calls.

84.     Ulery had his number registered to the National Do Not Call Registry at least 30 days prior to receiving these illegal calls, since on or about February 6th, 2008.

85.     Doughty had his number ending in "0995" registered to the National Do Not Call Registry at least 30 days prior to receiving these illegal calls, since on or about September 11, 2007, and his number ending in "4946" has been registered on the National Do Not Call Registry since October 6, 2011.

---

[7].     *Fcc Mandates That Phone Companies Implement Caller Id Authentication to Combat Spoofed Robocalls*, 2020 WL 1634509, at *2 (OHMSV Mar. 31, 2020)

## LIABILITY FOR CALLS PLACED BY THIRD PARTIES

86.     To the extent Defendants outsourced their robocalling, they are still liable for calls that violate the TCPA.

87.     Defendants are liable for third-parties' actions because they took steps to cause the calls to be made, and because the calls were made pursuant to Defendant's actual authority, apparent authority and/or ratification, or pursuant to joint enterprise or acting in concert liability.

## Direct Liability

88.     On May 9, 2013, the FCC's Declaratory Ruling confirmed that sellers may not avoid liability by outsourcing telemarketing:

> [A]llowing the seller to avoid potential liability by outsourcing its telemarketing activities to unsupervised third parties would leave consumers in many cases without an effective remedy for telemarketing intrusions.  This would particularly be so if the telemarketers were judgment proof, unidentifiable, or located outside of the United States, as is often the case.  Even where third-party telemarketers are identifiable, solvent, and amenable to judgment limiting liability to the telemarketer that physically places the call would make enforcement in many cases substantially more expensive and less efficient, since consumers (or law enforcement agencies) would be required to sue each marketer separately in order to obtain relief.  As the FTC noted, because "[s]ellers may have thousands of "independent" marketers, suing one or a few of them is unlikely to make a substantive difference for consumer privacy.
>
> *In re Joint Petition Filed by DISH Network, LLC et al. for Declaratory Ruling Concerning the TCPA Rules, 28 FCC Rcd. 6574, at ¶ 37 (2013) ("FCC 2013 Ruling"),* 28 FCC Rcd at 6588 (¶37) (internal citations omitted).

89.     Defendants are directly liable for the telemarketing calls at issue because they authorized and/or facilitated the selling of insurance products during these calls and profited off

the leads and sales generated from such calls, and intended to profit off the leads even if no deal or sale was eventually closed.

90.     Defendants have absolute control over whether, and under what circumstances, they accept leads from potential customers.

### Agency

91.     Moreover, the *May 2013 FCC* Ruling rejected a narrow view of TCPA liability, including the assertion that a seller's liability requires a finding of formal actual agency and immediate direction and control over third parties who place a telemarketing call.  *Id.* at 6587 n. 107.

92.      Prior to conducting discovery, due to the anonymous nature of robocalling, Plaintiffs many times have no way to confirm and identify the exact party who called their phones. For the purposes of TCPA liability, Plaintiff is not required or expected to know this information at the pleading stage.

93.      Nevertheless, Insurance Supermarket, through its counsel, has already confirmed that Doughty was called on behalf of Insurance Supermarket using the "Sam" script. Insurance Supermarket has also now disclosed in this litigation the identity of its vendor, EDM, involved with the placement of the "Sam" calls.

94.     The *May 2013 FCC* Ruling states that called parties may obtain "evidence of these kinds of relationships… through discovery, if they are not independently privy to such information."  *Id.* at 6592-593 (¶46).  Moreover, evidence of circumstances pointing to apparent authority on behalf of the telemarketer "should be sufficient to place upon the seller the burden of

demonstrating that a reasonable consumer would not sensibly assume that the telemarketer was acting as the seller's authorized agent." *Id.* at 6593 (¶46).

95.     Here, Defendants authorized its telemarketers to generate prospective customers, and authorized those telemarketers to direct transfer those live leads to their live Gatekeepers and live in-house specialists. Defendants utilized a systematic telemarketing campaign whereby robocalls were placed in a seamless process to make it appear to Plaintiffs and Class Members that Defendants were calling them directly, or that they were being called on Defendants' behalf, from Defendants' authorized telemarketing department or call center.

96.     Defendants hired, permitted, and enjoyed the benefits of the mass robocalling.

97.     The FCC has explained that its "rules generally establish that the party on whose behalf a solicitation is made bears ultimate responsibility for any violations." *See In re Rules & Regulations Implementing the TCPA,* CC Docket No. 92-90, Memorandum Opinion and Order, 10 FCC Rcd 12391, 12397 (13) (1995).

98.     The FCC stated within their January 4, 2008 ruling, that a company on whose behalf a telephone call is made bears the ultimate responsibility for any violations.

99.     The *May 2013 FCC Ruling* held that, even in the absence of evidence of a formal contractual relationship between the seller and the telemarketer, a seller is liable for telemarketing calls if the telemarketer "has apparent (if not actual) authority" to make the calls.  28 FCC Rcd at 6586 (34). Moreover, evidence of circumstances pointing to apparent authority on behalf of the telemarketer "should be sufficient to place upon the seller the burden of demonstrating that a reasonable consumer would not sensibly assume that the telemarketer was acting as the seller's authorized agent." *Id.* at ¶ 46. Nevertheless, Insurance Supermarket does have in place a formal

24

relationship for which both it and its lead generator/marketer, EDM, derives financial and economic benefits, the extent of which will be the subject of discovery.

100.    Defendants provided at least interim instructions and day-to-day control over the actions of their agents regarding the calls.

101.    Defendants had the ability to prohibit their agents from using a pre-recorded message to contact potential customers, and to prohibit the use of calls using an ATDS and to DNC registered numbers. *See* Restatement (Third) of Agency § 1.01 (2006) ("A principal's right to control the agent is a constant across relationships of agency").

102.    Defendants were able to restrict or specify the geographic location and/or volume of the calls. Here, Defendants specified that the calls to Plaintiffs should be directed to at least the Colorado and Texas markets.

103.    Defendants requested and sought from its telemarketers to solicit particular target customer profiles on a mass scale.

104.    Defendants specified the criteria of potential customers that would be most profitable for Defendants to sell to after they had been robocalled, including obtaining pre-qualifying information such as the prospective customer's name, age and location.

105.    Defendants integrated their systems or shared information and/or were provided lead lists, so they could access the records of people with whom they called and Defendants otherwise provided and shared records and data concerning the persons called.

106.    Defendants had access to the sales and customers generated by the illegal robocalling at issue in this case.

107.    The *May 2013 FCC Ruling* also clarifies circumstances under which a telemarketer has apparent authority.

108.     Defendants authorized their marketers to generate prospective customers for it.

109.     Plaintiffs reasonably believed that the telemarketers who called him had received permission, authority, and instruction to conduct activity on behalf of principal Defendant.

110.     By accepting these leads, Insurance Supermarket "manifest[ed] assent or otherwise consent[ed]… to act" on behalf of its telemarketers, as described in the Restatement (Third) of Agency.

111.     Furthermore, Insurance Supermarket consented and/or provided express or implied authority to its agents to hold themselves out as Insurance Supermarket's sales representatives or agents.

112.     Regardless of if Defendants directly initiated these calls, they are directly liable for their own participation and involvement in making and facilitating the calls at issue. *Maryland v. Universal Elections, Inc.*, 729 F.3d 370, 378 (4th Cir. 2013), also compare 47 U.S.C. § 227(b)(1)(A)(iii) (prohibiting the "making" of such calls), *with* 47 U.S.C. § 227(c)(5) (prohibiting the "initiating" calls).

113.     The Federal Communications Commission ("FCC") has instructed that resellers, like Defendants may contend that it is, may not avoid liability by outsourcing telemarketing. *FCC 2013 Ruling at ¶ 37"*.

114.     Third-party lead generators, like EDM, that Insurance Supermarket may employ or hire, make or facilitate the autodialed and prerecorded message calls described herein "on behalf of" Insurance Supermarket within the meaning of the FCC's Declaratory Rulings and 47 U.S.C. § 227(c)(5).

115.     More specifically, the *FCC 2013 Ruling* held that, even in the absence of evidence of a formal contractual relationship between the seller and the telemarketer, a seller is liable for

telemarketing calls if the telemarketer "has apparent (if not actual) authority" to make the calls. 28 FCC Rcd. at ¶ 34.

**Ratification**

116.    Further, Defendants ratified the unlawful calls by knowingly accepting business that originated through illegal robocalls, including the benefit of a large volume of sales.

117.    Despite being on notice of violations, Defendants continues to work with companies that perform illegal robocalling.

118.    Defendants took advantage of the violations by having their authorized salespeople solicit prospective customers while turning a blind eye to the way the potential customer was identified.

119. Defendants endorsed the calling tactics because they were aware, or should have been aware through the exercise of reasonable diligence, that telemarketers working on their behalf, were violating the TCPA.

120.  Defendants failed to properly monitor telemarketers operating on their behalf and accepted business that originated through the illegal telemarketing calls.

121.  Defendants here cannot legally accept business derived from telemarketing, if the entities that are initiating such telephone calls that violate the TCPA in any respect, including those that do not have or adhere to valid Do Not Call policies. Pursuant to the TCPA, 47 U.S.C. § 227(c)(5) and 47 C.F.R. § 64.1200, sellers like Defendants here are liable for noncompliant calls initiated by telemarketers on their behalf.

## CLASS ACTION ALLEGATIONS

122.    Plaintiffs brings this class action under Rule 23(a),(b)(2), and(b)(3) of the Federal Rules of Civil Procedure on behalf of themselves and of a similarly situated "Class" or "Class Members" defined as:

> **Robocall Class:** All persons in the United States who, within the four (4) years prior to the filing of the original Complaint received a call from Defendants or anyone on Defendants' behalf, to said person's cellular telephone number, for the purpose of advertising Defendants' products or services, using the same or substantially similar artificial or prerecorded voice or similar dialing system used to call Plaintiffs, without the recipients' prior express written consent, in violation of the TCPA.

> **Do Not Call Registry Class:**  All people in the United States who from four years prior to the filing of this action (1) were called by or on behalf of Defendants; (2) more than one time within any 12-month period; (3) where the person's telephone number had been listed on the National Do Not Call Registry for at least thirty days; (4) for the purpose of promoting or selling Defendants' products and services; and (5) for whom Defendants' claim (a) they did not obtain prior express written consent, or (b) they obtained prior express written consent in the same manner as Defendants claim they supposedly obtained prior express written consent to call the Plaintiffs.

> **INTERNAL DNC CLASS:** All persons within the United States who, within the four years prior to the filing of the original Complaint through the date of class certification, (1) received two or more calls within any 12-month period, (2) encouraging the purchase of Defendants property, goods, or services, (3) to said person's residential telephone number, (4) after requesting that Defendants or Defendants' vendor's "stop" or making similar request.

> **SELLER IDENTIFICATION CLASS:** All persons within the United States who, within the four years prior to the filing of the original Complaint through the date of class certification, (1) received two or more calls within any 12-month period, (2) regarding Defendants' property, goods, and/or services, (3) to said person's residential telephone number, (4) that did not disclose the name of the individual caller, the name of the person or entity on whose behalf the call is being made, or a telephone number or address at which the person or entity may be contacted.

123.     Additionally, Plaintiff Doughty brings this action on behalf of himself and the following classes:

> **Texas § 305.053 Class**: All residents of the State of Texas who, within the four years prior to the filing of this Amended Complaint through the date of certification, to whose telephone number Defendants: (1) placed (or had placed on their behalf) a call in violation of 47 U.S.C. § 227 or a regulation adopted under that provision.

124.     Excluded from the Classes are Defendants, and any subsidiary or affiliate of Defendants, and the directors, officers and employees of Defendants or their subsidiaries or affiliates, and members of the federal judiciary.

125.     This action has been brought and may properly be maintained as a class action against Defendants pursuant to Rule 23 of the Federal Rules of Civil Procedure because there is a well-defined community of interest in the litigation and the proposed Class is easily ascertainable. Plaintiffs reserve the right to amend the Class definitions if discovery and further investigation reveal that any Class should be expanded or otherwise modified, including redefining the Classes by state, geography, or limiting it to those that received calls from the same vendor(s) that called Plaintiff and Doughty.

126.     **Numerosity**: At this time, Plaintiffs do not know the exact number of Class Members, but among other things, given the nature of the claims and that Defendants' conduct consisted of standardized marketing phone calls placed to cellular telephone numbers, Plaintiffs believe, at a minimum, there are greater than forty (40) Class Members.  Plaintiffs believe that the Classes are so numerous that joinder of all members of the Classes is impracticable and the disposition of their claims in a class action rather than incremental individual actions will benefit

the Parties and the Court by eliminating the possibility of inconsistent or varying adjudications of individual actions.

127.    Upon information and belief, a more precise Class size and the identities of the individual members thereof are ascertainable through Defendants' or their vendor(s)' records, including, but not limited to Defendants' or their vendor(s)' calls and personnel records.

128.    Members of the Classes may additionally or alternatively be notified of the pendency of this action by techniques and forms commonly used in class actions, such as by published notice, e-mail notice, website notice, fax notice, first class mail, or combinations thereof, or by other methods suitable to this class and deemed necessary and/or appropriate by the Court.

129.    **Existence and Predominance of Common Questions of Fact and Law**: There is a well-defined community of common questions of fact and law affecting the Plaintiffs and members of the Classes. Common questions of law and/or fact exist as to all members of the Classes and predominate over the questions affecting individual Class members. These common legal and/or factual questions include, but are not limited to, the following:

a)    Whether Plaintiffs and Class Members registered a phone number on the National Do Not Call Registry;

b)    Whether, during the class period Defendants or their agents called (other than a phone call made for emergency purposes or made with the prior consent of the called party) to a Class member using any automatic dialing system to any telephone number assigned to a cellular phone service;

c)    Whether, during the class period Defendants or their agents called (other than a phone call made for emergency purposes or made with the prior consent of the called party) to a Class member using a prerecorded message or artificial voice.

30

d)   Whether Defendants had "prior express consent" under the TCPA to call the cell phone numbers of Plaintiffs Class Members;

e)   Whether Defendants instituted procedures for maintaining a list of persons who request not to receive telemarketing calls that met the standards set forth in 47 C.F.R. § 64.1200(d);

f)   How Defendants obtained the phone numbers of Plaintiffs and Class Members;

g)   Whether Defendants engaged in telemarketing content when they made the calls which are the subject of this lawsuit;

h)   Whether the calls made to Plaintiffs and Class Members violate the TCPA and its regulations;

i)   Whether Defendants willfully or knowingly violated the TCPA or the rules prescribed under it;

j)   Whether Plaintiffs and the members of the Class are entitled to statutory damages, treble damages, and attorney fees and costs for Defendants' acts and conduct;

k)   Whether Plaintiff and members of the Class are entitled to a permanent injunction enjoining Defendants from continuing to engage in its unlawful conduct; and

l)   Whether Plaintiffs and the Class are entitled to any other relief.

130.   One or more questions or issues of law and/or fact regarding Defendants' liability are common to all Class Members and predominate over any individual issues that may exist and may serve as a basis for class certification under Rule 23(c)(4).

131.   **Typicality**: Plaintiffs' claims are typical of the claims of the members of the Classes. The claims of the Plaintiffs and members of the Classes are based on the same legal theories and arise from the same course of conduct that violates the TCPA.

132.     Plaintiffs and members of the Do-Not-Call-Registry Class each received more than one phone call within a 12-month time period, which Defendants placed or caused to be placed to Plaintiffs and the members of the Class.

133.     **Adequacy of Representation:** Plaintiffs are adequate representatives of the Classes because Plaintiffs' interests do not conflict with the interests of the members of the Class. Plaintiffs will fairly, adequately and vigorously represent and protect the interests of the members of the Class and has no interests antagonistic to the members of the Class. Plaintiffs have retained counsel competent and experienced in litigation in the federal courts, TCPA litigation, and class action litigation.

134.     **Superiority**: A class action is superior to other available means for the fair and efficient adjudication of the claims of the Class. While the aggregate damages which may be awarded to the members of the Class are likely to be substantial, the damages suffered by individual members of the Class are relatively small. As a result, the expense and burden of individual litigation makes it economically infeasible and procedurally impracticable for each member of the Class to individually seek redress for the wrongs done to them. Plaintiffs do not know of any other litigation concerning this controversy already commenced against Defendants by any member of the Class. The likelihood of the individual members of the Class prosecuting separate claims is remote. Individualized litigation would also present the potential for varying, inconsistent or contradictory judgments, and would increase the delay and expense to all parties and the court system resulting from multiple trials of the same factual issues. In contrast, the conduct of this matter as a class action presents fewer management difficulties, conserves the resources of the parties and the court system, and would protect the rights of each member of the

Class. Plaintiffs know of no difficulty to be encountered in the management of this action that would preclude its maintenance as a class action.

135.   **Class-Wide Injunctive Relief and Rule 23(b)(2):** Moreover, as an alternative to or in addition to certification of the Class under Rule 23(b)(3), class certification is warranted under Rule 23(b)(2) because Defendants have acted on grounds generally applicable to Plaintiffs and members of Class, thereby making appropriate final injunctive relief with respect to Plaintiffs and Class Members as a whole.  Plaintiffs seek injunctive relief on behalf of Class Members on grounds generally applicable to the entire Class in order to enjoin and prevent Defendants' ongoing violations of the TCPA, and to order Defendants to provide notice to them of their rights under the TCPA to statutory damages and to be free from unwanted calls.

**COUNT I**
**VIOLATIONS OF THE TELEPHONE CONSUMER PROTECTION ACT**
**47 U.S.C. § 227(b)**
**(On Behalf of Plaintiffs and the Robocall Class)**

136.   Plaintiffs incorporate by reference all the allegations contained in paragraphs 1 through 135 above as though fully stated herein.

137.   It is a violation of the TCPA to make "any call (other than a call made for emergency purposes or made with the prior express consent of the called party) using any automatic telephone dialing system. . .to any telephone number assigned to a . . . cellular telephone service . . ." 47 U.S.C. § 227(b)(1)(A)(iii).

138.   Automatic telephone dialing system refers to "equipment which has the capacity---(A) to store or produce telephone numbers to be called, using a random or sequential number generator; and (B) to dial such numbers." 47 U.S.C. § 227(a)(1).

139.   Defendants – or third parties directed or authorized by Defendants – used

equipment having the capacity to randomly or sequentially generate telephone numbers and to dial such numbers without human intervention to make non-emergency telephone calls to the cellular telephone of Plaintiffs and the other members of the Class defined above.

140.   Additionally, and/or alternatively, Defendants – or third parties directed by Defendants – used an artificial or prerecorded voice to deliver messages to Plaintiffs and other Class Members without prior consent.

141.   These calls were made without regard to whether or not Defendants had first obtained express permission from the called party to make such calls. In fact, Defendants did not have prior express consent to call the cellular phones of Plaintiffs and the other members of the putative Class when its calls were made.

142.   Defendants have, therefore, violated Sec. 227(b)(1)(A)(iii) of the TCPA by using an automatic telephone dialing system to make non-emergency telephone calls using an artificial or prerecorded voice to the cellular phones of Plaintiffs and the other members of the putative Class without their prior express written consent.

143.   Furthermore, it is a violation of the TCPA "to initiate any telephone call to any residential telephone line using an artificial or prerecorded voice to deliver a message without the prior consent of the called party, unless the call is initiated for emergency purposes. . . ." 47 U.S.C. 227(b)(1)(B); 47 C.F.R. § 64.1200(a)(3).

144.   The foregoing acts and omissions of Defendants constitute numerous and multiple violations of the TCPA, including but not limited to each and every one of the above-cited provisions of 47 U.S.C. § 227 et seq.

145.   As a result of Defendants' negligent violations of 47 U.S.C. § 227 et seq., Plaintiffs and the Class are entitled to an award of $500.00 in statutory damages, for each and every violation,

pursuant to 47 U.S.C. § 227(b)(3)(B).

146.    At all relevant times, Defendants knew or should have known that their conduct as alleged herein violated the TCPA.

147.    Defendants knew that they did not have prior express consent to make these calls, and knew or should have known that their conduct was a violation of the TCPA.

148.    Because Defendants knew or should have known that Plaintiffs and Class Members did not give prior express consent to receive autodialed calls using an artificial or prerecorded voice, the Court should treble the amount of statutory damages available to Plaintiffs and members of the Putative Class pursuant to section 227(b)(3)(C) of the TCPA.

149.    Likewise, since Defendants knew or should have known that Plaintiffs and Class Members did not give prior express consent to receive calls from an ATDS or using an artificial or prerecorded voice, the Court should treble the amount of statutory damages available to Plaintiffs and members of the Putative Class pursuant to section 227(b)(3) of the TCPA.

150.    As a result of Defendants' knowing and/or willful violations of 47 U.S.C. § 227(b), Plaintiffs and the Class are entitled to an award of $1,500.00 in statutory damages, for each and every violation, pursuant to 47 U.S.C. § 227(b)(3)(C).

151.    Plaintiffs and the Class are also entitled to and seek injunctive relief prohibiting such conduct in the future.

WHEREFORE, Plaintiffs respectfully request the Court grant Plaintiffs and the Class Members relief against Defendants, individually and jointly, as set forth in the Prayer for Relief below.

**COUNT II**
**VIOLATION OF THE TELEPHONE CONSUMER PROTECTION ACT – 47 U.S.C. §227**
**(On Behalf of Plaintiffs and the Do Not Call Registry Class)**

152.    Plaintiffs incorporate by reference all the allegations contained in paragraphs 1 through 135 of this Amended Complaint as though fully stated herein.

153.    The TCPA's implementing regulation, 47 C.F.R. § 64.1200(c), provides that "[n]o person or entity shall initiate any telephone solicitation" to "[a] residential telephone subscriber who has registered his or her telephone number on the national do-not-call registry of persons who do not wish to receive telephone solicitations that is maintained by the federal government."

154.    47 C.F.R. § 64.1200(e), provides that 64.1200(c) and (d) "are applicable to any person or entity making telephone solicitations or telemarketing calls to wireless telephone numbers."

155.    47 C.F.R. § 64.1200(d) further provides that "[n]o person or entity shall initiate any call for telemarketing purposes to a residential telephone subscriber unless such person or entity has instituted procedures for maintaining a list of persons who request not to receive telemarketing calls made by or on behalf of that person or entity."

156.    Any "person who has received more than one telephone call within any 12-month period by or on behalf of the same entity in violation of the regulations prescribed under this subsection may" bring a private action based on a violation of said regulations, which were promulgated to protect telephone subscribers' privacy rights to avoid receiving telephone solicitations to which they object.  47 U.S.C. § 227(c).

157.    Defendants violated 47 C.F.R. § 64.1200(c) by initiating, or causing to be initiated, telephone solicitations to telephone subscribers such as Plaintiffs and the Do No Call Registry

Class members who registered their respective telephone numbers on the National Do Not Call Registry, a listing of persons who do not wish to receive telephone solicitations that is maintained by the federal government.

158.    Defendants violated 47 U.S.C. § 227(c)(5) because Plaintiffs and the Do Not Call Registry class received more than one telephone call in a 12-month period made by or on behalf of Defendant in violation of 47 C.F.R. § 64.1200, as described above.  As a result of Defendants' conduct as alleged herein, Plaintiffs and the Do Not Call Registry Class suffered actual damages and, under section 47 U.S.C. § 227(c), are entitled, *inter alia*, to receive up to $500 in damages for such violations of 47 C.F.R. § 64.1200.

159.    To the extent Defendants' misconduct is determined to be willful and knowing, the Court should, pursuant to 47 U.S.C. § 227(c)(5), treble the amount of statutory damages recoverable by the members of the Do Not Call Registry Class.

WHEREFORE, Plaintiffs respectfully request the Court grant Plaintiffs and the Class relief against Defendants, individually and jointly, as set forth in the Prayer for Relief below.

### COUNT III
### VIOLATIONS OF 47 U.S.C. § 227 and 47 C.F.R. § 64.1200
### (On Behalf of Plaintiffs and the Internal DNC Class)

160.    Plaintiffs incorporates by reference all the allegations contained in paragraphs 1 through 135 of this Amended Complaint as though fully stated herein.

161.    In pertinent part, 47 C.F.R. § 64.1200(d) provides:

> No person or entity shall initiate any call for telemarketing purposes to a residential telephone subscriber unless such person or entity has instituted procedures for maintaining a list of persons who request not to receive telemarketing calls made by or on behalf of that person or entity. The procedures instituted must meet the following minimum standards:

(1) ***Written policy***. Persons or entities making calls for telemarketing purposes must have a written policy, available upon demand, for maintaining a do-not-call list.

(2) ***Training of personnel engaged in telemarketing***. Personnel engaged in any aspect of telemarketing must be informed and trained in the existence and use of the do-not-call list.

(3) ***Recording, disclosure of do-not-call requests***. If a person or entity making a call for telemarketing purposes (or on whose behalf such a call is made) receives a request from a residential telephone subscriber not to receive calls from that person or entity, the person or entity must record the request and place the subscriber's name, if provided, and telephone number on the do-not-call list at the time the request is made. Persons or entities making calls for telemarketing purposes (or on whose behalf such calls are made) must honor a residential subscriber's do-not-call request within a reasonable time from the date such request is made. This period may not exceed thirty days from the date of such request. If such requests are recorded or maintained by a party other than the person or entity on whose behalf the telemarketing call is made, the person or entity on whose behalf the telemarketing call is made will be liable for any failures to honor the do-not- call request. A person or entity making a call for telemarketing purposes must obtain a consumer's prior express permission to share or forward the consumer's request not to be called to a party other than the person or entity on whose behalf a telemarketing call is made or an affiliated entity.

*      *      *

(6) ***Maintenance of do-not-call lists.*** A person or entity making calls for telemarketing purposes must maintain a record of a consumer's request not to receive further telemarketing calls. A do-not-call request must be honored for 5 years from the time the request is made.

162.    Pursuant to 47 C.F.R § 64.1200(e), the rules set forth in 47 C.F.R. § 64.1200(d) are applicable to any person or entity making telephone solicitations or telemarketing calls to wireless telephone numbers.

163.    Plaintiffs and the Internal DNC Class members made requests to not receive future solicitations.

164.    Defendants failed to honor Plaintiffs' and the Internal DNC Class members' opt-out requests.

165.    As outlined in detail above, Defendants have violated the requirements of section 64.1200(d) by failing to (1) maintain the required written policies; (2) provide any training to their personnel engaged in telemarketing; (3) maintain an internal do- not-call list and honor consumer opt-out requests; and (4) honoring opt-out requests.

166.    Pursuant to section 227(c)(5) of the TCPA, Plaintiffs and the Internal DNC Class members are entitled to an award of $500.00 in statutory damages, for each call sent by, or an behalf of, Defendants.

167.    To the extent Defendants' misconduct is determined to be willful and knowing, the Court should treble the amount of statutory damages recoverable by the members of the Internal DNC Class.

168.    Plaintiffs and the Internal DNC Class members also seek injunctive relief prohibiting Defendants' illegal conduct in the future, pursuant to section 227(c)(5).

WHEREFORE, Plaintiffs respectfully request the Court grant Plaintiffs and the Class members relief against Defendants, individually and jointly, as set forth in the Prayer for Relief below.

## COUNT IV
## VIOLATIONS OF 47 U.S.C. § 227(c) AND 47 C.F.R. § 64.1200(d)
## <u>(On Behalf of Plaintiffs and the Seller Identification Class</u>)

169.    Plaintiffs incorporate by reference all the allegations contained in paragraphs 1 through 135 of this Amended Complaint as though fully stated herein.

170.    In pertinent part, 47 C.F.R. § 64.1200(d) provides:

> **(4)** *Identification of sellers and telemarketers.* A person or entity making a call for telemarketing purposes must provide the called party with the name of the individual caller, the name of the person or entity on whose behalf the call is being made, and a telephone number or address at which the person or entity may be contacted. The telephone number provided may not be a 900 number or any other number for which charges exceed local or long distance transmission charges.

171.    Pursuant to 47 C.F.R § 64.1200(c), the rules set forth in 47 C.F.R. § 64.1200(d) are applicable to any person or entity making telephone solicitations or telemarketing calls to wireless telephone numbers.

172.    Defendants violated the requirements of section 64.1200(d)(4) by failing to identify (1) the name of the individual caller; (2) the name of the legal entity on whose behalf the call was being made; and (3) a telephone number or address at which Defendants may be contacted.

173.    Pursuant to section 227(c)(5) of the TCPA, Plaintiffs and the Seller Identification Class members are entitled to an award of $500.00 in statutory damages, for each call sent by Defendants or on Defendants' behalf.

174.    To the extent Defendants' misconduct is determined to be willful and knowing, the Court should, pursuant to 47 U.S.C. § 227(c)(5), treble the amount of statutory damages recoverable.

WHEREFORE, Plaintiffs respectfully request the Court grant Plaintiffs and the Class relief against Defendants, individually and jointly, as set forth in the Prayer for Relief below.

## COUNT V
### Violations of Texas Business and Commerce Code, § 305.053
### (On Behalf of Plaintiff Doughty and the Texas § 305.053 Class)

175.     Plaintiff Doughty incorporates by reference all the allegations contained in paragraphs 1 through 135 of this Amended Complaint as though fully stated herein.

176.     This Court has supplemental jurisdiction over this state law claim under 28 U.S.C. § 1367(a), because they are so closely related to the federal claims that they form a single case or controversy.

177.     Doughty is, and at all times mentioned herein was, a "person" as defined by Tex. Bus. & Com. Code § 1.201(b)(27).

178.     Doughty is, and at all times mentioned herein was, a "purchaser" as defined by Tex. Bus. & Com. Code § 302.001(3).

179.     Defendants are and at all times mentioned herein were, a "person" as defined by Tex. Bus. & Com. Code § 1.201(b)(27).

180.     Defendants placed in a 12-month period at least one and many times more than one telemarketing telephone calls to Doughty's and the Texas § 305.053 Class Members' respective telephone numbers using an artificial or prerecorded voice and when those numbers were registered on the National Do Not Call Registry.

181.     Each of these calls violated 47 U.S.C. § 227 or a regulation adopted under that provision.

182.     Doughty and the Texas § 305.053 Class Members are entitled to:

41

a) permanent injunction to prevent any further violations of the Texas Business & Commerce Code, Chapter 305;

b) the greater of $500 for each violation or Doughty's and Class Members' actual damages (see Tex. Bus. & Com. Code §304.053(b);

c) the greater of $1,500 for each violation or Doughty's and Class Members' actual damages for each call made knowingly or intentionally (see Tex. Bus. & Com. Code §304.053(c).

183.    Pursuant to section 305.053(a) of the Texas Business & Commerce Code, a person who receives a communication that violates 47 U.S.C. § 227, or a regulation adopted under that provision, may bring an action against the person who originates the communication for an injunction, damages or both. Doughty seeks an injunction to stop the wrongful conduct.

WHEREFORE, Plaintiff Doughty respectfully requests the Court grant him and the Class relief against Defendants, individually and jointly. as set forth in the Prayer for Relief below.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs request that the Court enter judgment in their favor and in favor of the respective classes, against Defendants, individually and jointly, for:

1. An order certifying this case as a class action, certifying Plaintiffs as representatives of the Classes, and designating Plaintiffs' counsel as Class counsel;

2. Statutory damages of $500 per call, per violation, for each provision of the TCPA alleged to be violated;

3. Willful damages at $1,500 per call, per violation, for each provision of the TCPA alleged to be violated;

42

4.   On behalf of Doughty, statutory damages of $500 per call in violation of the Texas Business and Commerce Code alleged to be violated;

5.   On behalf of Doughty, willful damages at $1,500 per call in violation of the Texas Business and Commerce Code alleged to be violated;

6.   A declaration that Defendants' practices described herein violate the Telephone Consumer Protection Act, 47 U.S.C. § 227(b)(1)(A)(iii);

7.   An injunction prohibiting Defendants from calling any individual whose number appears on the National Do Not Call Registry and on Defendants' internal DNC list;

8.   On behalf of Doughty, an injunction prohibiting Defendants from violating the Texas Business and Commerce Code alleged to be violated;

9.   Reasonable attorney's fees and costs; and

10.   Such further and other relief as this Court deems reasonable and just under the circumstances.

## **DEMAND FOR JURY TRIAL**

Plaintiffs, DAVID ULERY and THOMAS DOUGHTY, demand a trial by jury on all appropriate claims.

**Dated: June 8, 2023.**                                   Respectfully Submitted,

**EGGNATZ | PASCUCCI**                    **JORDAN RICHARDS, PLLC**
7450 Griffin Road, Suite 230                 1800 SE 10th Avenue, Suite 205
Davie, Florida 33314                              Fort Lauderdale, Florida 33316
Tel: (954) 889-3359                               Tel: (954) 871-0050
*Counsel for Plaintiff*                              *Counsel for Plaintiff*

By: */s/ Joshua H. Eggnatz*          By: */s/ Jordan Richards*        
JOSHUA H. EGGNATZ, ESQUIRE      JORDAN RICHARDS, ESQUIRE
Florida Bar No. 006726               Florida Bar No. 108372
                     *Jordan@jordanrichardspllc.com*
*JEggnatz@JusticeEarned.com*       *Jake@jordanrichardspllc.com*
*MPascucci@JusticeEarned.com*

By:      */s/ Chris R. Miltenberger*         
       Chris R. Miltenberger
       Texas State Bar Number 14171200

The Law Office of Chris R. Miltenberger,
PLLC
1360 N. White Chapel, Suite 200
Southlake, Texas 76092
817-416-5060 (office)
817-416-5062 (fax)
chris@crmlawpractice.com

## CERTIFICATE OF SERVICE

**I HEREBY CERTIFY** that the foregoing document was filed via CM/ECF on June 8, 2023 and that the foregoing was served on all counsel of record.

*/s/ Joshua H. Eggnatz*

Joshua H. Eggnatz, Esq.

## Service List

Jessica S. Reed-Baum
Email: Jessica.Reed-Baum@JacksonLewis.com
**JACKSON LEWIS P.C.**
950 17th Street, Suite 2600
Denver, CO 80202

Telephone: (303) 892-0404
Facsimile: (303) 892-5575

Amanda A. Simpson
Email :  Amanda.Simpson@JacksonLewis.com
**JACKSON LEWIS P.C.**
390 N. Orange Avenue, Suite 1285
Orlando, FL 32801
Telephone: (407) 246-8440

*Attorney for Defendant, Insurance Supermarket, Inc.*